```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3     _____
       CLIFF CROWLEY, ET AL          )
 4                      Plaintiffs   ) NO: 3:09cv1991(JCH)
                                     )
 5     vs.                           ) November 16, 2011
                                     ) 12:15 p.m.
 6                                   )
       ANGELO COSTA, ET AL,          )
 7                      Defendants.  )
       _____
 8                                      915 Lafayette Boulevard
                                        Bridgeport, Connecticut
 9
                          ORAL ARGUMENT
10

11     B E F O R E:
                        THE HONORABLE JANET C. HALL, U.S.D.J.
12
       A P P E A R A N C E S:
13

14     For the Plaintiffs  :    Thomas L. Tisdale
                                 Timothy Nast
15                               Tisdale Law Offices LLC
                                 10 Spruce St.
16                               Southport, CT 06890

17
       For the Defendants  :    Kenneth Wynne Bohonnon
18                               Bohonnon Law Firm, LLC
                                 195 Church Street
19                               New Haven, CT 06510

20

21     Court Reporter      :       Terri Fidanza, RPR

22
       Proceedings recorded by mechanical stenography,
23     transcript produced by computer.

24

25
```

1          THE COURT:  Good afternoon to you.  I apologize

2     for the delay.  As you saw, I was previously engaged.

3     We're here this afternoon in the matter of the Crowley

4     versus Costa 209CV1991.  There's a pending motion for

5     summary judgment, number 36, and the cross motion for

6     summary judgment, number 42.  What I would like to do

7     today is I have some questions.  I know we are in

8     admiralty court.  I have to say we don't get that many

9     admiralty cases so I need to be educated.  I hope you are

10    not too appalled by some of my questions.  I assume you

11    would be better off happier with me asking them opposed

12    to not asking them and having no clue.  I think we'll

13    start with the defendant.  I think his motion was first.

14    First I guess could we have appearances

15          MR. BOHONNON:  Wynne Bohonnon.  I represent the

16    defendants in this case, the Costas.

17          THE COURT:  Good afternoon to you, sir.

18          MR. TISDALE:  Thomas Tisdale.  With me is

19    Timothy Nast.  We represent Mr. Crowley and the

20    underwriters.

21          THE COURT:  Great.  As I said, I will start with

22    you.  You both again I will embarrass myself but what the

23    heck.  I'm past caring.  Both of your names sound

24    incredibly familiar to me but neither of you look

25    familiar.  Either we're all getting old and I have known

1    you don't look old.  Either do I I should add quickly.

2    Do I know either of you?  Have I been in a case with you

3    as a lawyer or maybe I had cases with you.

4              MR. TISDALE:  We tried a case together, your

5    Honor, about I will say five years ago maybe even a

6    little bit longer than that.  It was an accident during a

7    yachting case.  All I can remember the name of the boat

8    was Good to the Last Drop.  The plaintiff's name was

9    Maxwell.  I couldn't tell you who my client was.

10             THE COURT:  That explains your name.  Why is

11   yours.

12             MR. BOHONNON:  I practice in New Haven.  I have

13   had the privilege of having cases in front of your Honor.

14   I think they have been settled.

15             THE COURT:  I think I have seen both of your

16   names on the several cases but I didn't recognize you.

17   My apologies.  Anyway defendant.  You did note that the

18   Crowley cross motion was late.  As I understand it, it

19   came in sort of in opposition to your motion and as a

20   cross motion.  Have you suffered any prejudice because of

21   that?

22             MR. BOHONNON:  No.

23             THE COURT:  Let me start with some basics.

24   We're talking about liability here.  Who bears the burden

25   in this case?

1        MR. BOHONNON:   The burden is -- burden is as I

2    understand, your Honor, they filed a limitation of

3    liability.

4        THE COURT:   That's one of my questions for the

5    plaintiffs so I may come back to you on that subject.

6        MR. BOHONNON:   There's a presumption of

7    negligence when a vessel breaks free of its mooring and

8    strikes a pier.   I think that the burden is borne by the

9    vessel that strikes the pier and can be overcome by

10   whatever defenses they have to it.

11       THE COURT:   That's the Louisiana rule.

12       MR. BOHONNON:   Absolutely, your Honor.

13       THE COURT:   And what do you think -- I assume

14   you're correct and the burden is on the Crowleys but I

15   understand it is et al but on Crowley, what does he have

16   to prove to in effect overcome the presumption or

17   establish that he's had whatever duty he has.

18       MR. BOHONNON:   He has to establish that he used

19   due care in somehow making the vessel seaworthy while it

20   was moored so the occurrence of it breaking was not

21   something that he caused.

22       THE COURT:   You would agree with me that a

23   vessel could break loose from a mooring and there would

24   be no violation of duty of care in certain circumstances.

25   We could come up with one the hypothetical.

1            MR. BOHONNON:  Absolutely.

2            THE COURT:  It is not a strict liability in

3    other words?

4            MR. BOHONNON:  No, absolutely.

5            THE COURT:  So you rely in your summary judgment

6    motion on the Harbor Master's testimony.  His name is

7    Scinto.  That a prudent boater would check the lines.  I

8    think there's a cases that talks about that.

9            MR. BOHONNON:  Correct.

10           THE COURT:  Does that establish by itself

11   without regard to other circumstances the duty of care?

12   In other words, that every boat owner should always check

13   the lines and when you don't, then they can't overcome

14   the presumption.

15           MR. BOHONNON:  No.  I think there are other

16   things that have to be done.

17           THE COURT:  What about weather?  You moved for

18   summary judgment but there seems to me to be an issue of

19   fact.  You argue that the plaintiff doesn't have an

20   expert but he's introduced evidence about what the winds

21   were and what the forecast was versus actual.  Isn't that

22   sufficient to raise an issue of fact as to your expert's

23   opining that this was normal weather I think if I got it

24   right.  I may not used the right word.

25           MR. BOHONNON:  I don't think so.  I think based

1    on your ruling in Tatum versus Oberg that, in fact,

2    raising a factual dispute saying that the weather is fine

3    but not producing any evidence of that, not producing any

4    kind of --

5              THE COURT:  Does he have to have an expert?

6              MR. BOHONNON:  Doesn't have to have an expert

7    but the weather is something that's so easily interpreted

8    by an expert and so easily susceptible to common

9    knowledge.  A newspaper article, a television report,

10   anything that says there was a horrendous storm that day

11   that was never predicted.  That simply didn't happen.

12   Your Honor will certainly note during Hurricane Katrina

13   there were enumerable instances where the defenses of act

14   of God or peril of the sea were brought.  That was

15   weather that was so sufficiently heavy that nothing could

16   have been done.

17             THE COURT:  Didn't the plaintiff come forward

18   with evidence that the forecast and the predicted, not

19   swells, but whatever.  When it gusts, gusts were roughly

20   10 miles per hour higher than predicted in actuality?

21             MR. BOHONNON:  I believe it was in the form of

22   an affidavit.  It wasn't in the form of anyone who had

23   the ability.  Some sort of inherent reliability in that

24   information other than the bald face assertion.

25             THE COURT:  I believe that there was testimony I

1    think by Billings that there were eight other boats that

2    night that broke free.

3            MR. BOHONNON:  Yes.

4            THE COURT:  Is that probative as to whether

5    Crowley was negligent as to his mooring?

6            MR. BOHONNON:  I don't think so, your Honor.  It

7    depends on what the circumstances were when those boats

8    broke loose at that time in October.  Late October is a

9    bad time to have a boat on a mooring.  Whether they broke

10   free the moorings or broke free from docks, they were

11   tied up to the docks how they were stored.  They could

12   have been as some other vessels were kept on short side

13   docks and the water could have roped them off.  It was

14   never quantified as to how they broke loose.

15           THE COURT:  I thought the testimony was meaning

16   the line broke.

17           MR. BOHONNON:  Or how he became free from

18   whatever mooring or whatever where they were secured.

19           THE COURT:  The Harbor Master said we never had

20   any boats break free.  I agree with you that in the

21   abstract.  It could be 100,000 boats in the harbor.  Of

22   course, there aren't.  So eight maybe very small number

23   or could be.  There's twenty boats and eight is enormous.

24   It seems to me in some context the evidence that eight

25   boats broke free could be probative.  Not conclusive but

1    probative of the issue of, you know, was this an

2    extraordinary event.  Was this unusual weather especially

3    the coupled with the weather predictions changed.

4            MR. BOHONNON:  I think all of those things taken

5    together would be probative but, your Honor, that's how

6    they were presented.

7            THE COURT:  Say again it is not what.

8            MR. BOHONNON:  That's not how they were

9    presented.  Billings' testimony wasn't that if occurrence

10   of the weather, whatever other conditions were, led to

11   eight other vessels being loose, what Billings testified

12   to is, look, I am the head of the Black Rock Yacht Club.

13   I know about this mooring.  I know why this mooring was

14   placed in the way it was.  I know why it doesn't break

15   loose.  What he found out he didn't know that the harbor

16   master Scinto testified there was no mooring permit for

17   2008.

18           THE COURT:  I think that's disputed.  There's

19   record evidence about how he probably had a permit.

20           MR. BOHONNON:  That was argument.

21           THE COURT:  I read the deposition transcript of

22   that.

23           MR. BOHONNON:  That's correct but it was an

24   argument in the colloquy.  Couldn't it be this or

25   couldn't it be that.  I think that's, you know.  It does

1    not establish because there was no canceled check.  There

2    was no copy of the application.

3         THE COURT:  What does it matter if they didn't

4    have a mooring permit whatever the record is?

5         MR. BOHONNON:  The City of Bridgeport has

6    requirements for what is actually put down there.  So at

7    the time they get the permit and they get the check, they

8    then go over and look and make sure.

9         THE COURT:  I understand.  What evidence is in

10   the record to show that because he didn't comply with

11   that as you argue.  I'm suggesting he's arguing the

12   contrary.  As you argue that's what caused his boat to

13   break loose.

14        MR. BOHONNON:  There isn't any.  That goes to

15   the steps the reasonably prudent steps he should have

16   taken knowing that the weather was bad.

17        MR. BOHONNON:  In other words, Bridgeport wants

18   you to put down 500 pound concrete block at the bottom of

19   the harbor and have three rings in it so you can tie off

20   three different whatever, I'm making this up, if he

21   didn't get a permit and never got checked but it isn't

22   because he didn't have the three things, the 500 pound

23   block.  I don't know why that's relevant to his

24   liability.

25        MR. BOHONNON:  It goes to the level of prudence

1    and the level of scrutiny that the City of Bridgeport

2    requires.  They require at a minimum, whatever, suggested

3    they would have had a chance to check and would have been

4    caught at that time if it wasn't done.

5              THE COURT:  If it doesn't cause the break away

6    on the boat, why is it relevant?

7              I understand it may mean in that general sense

8    Mr. Crowley isn't a prudent man.  He doesn't get permits,

9    doesn't comply with a what Bridgeport wants if the boat

10   broke away because he didn't secure with the right on the

11   bottom end of the rope.  I'm not on a boat person so that

12   it doesn't matter what was happening in the mooring under

13   water.

14             MR. BOHONNON:  Probably not.  I think the lack

15   of diligence in following the standard of care for

16   checking the vessel when the weather was predicted was a

17   problem.

18             THE COURT:  Does it make a difference how

19   quickly the storm comes up as to prudence and checking,

20   et cetera?

21             MR. BOHONNON:  Not in this case because the

22   testimony was that for four days the weather that was

23   forecast was in fact not unusual for that time and place

24   and was the weather that was experienced.

25             THE COURT:  Well.  We go back to what record

1    evidence the plaintiff has.

2            MR. BOHONNON:  As late as the 25th as late as

3    the 25th, the accident happened the night of the 25.  The

4    plaintiff was on a plane back from Europe.

5            THE COURT:  If you own a boat, you can't leave

6    the vicinity of the boat because God forbid you should

7    have to check your line the minute before it is going to

8    break away.  He made it clear he could have called for

9    the assistance of someone else to check the lines if he

10   thought it was a problem.

11           MR. BOHONNON:  He didn't do that.

12           THE COURT:  I understand he didn't do that.  I'm

13   trying to press you on why is it relevant he's on a plane

14   from England.

15           MR. BOHONNON:  This night when they came back,

16   he got a call from someone at the site and said, look,

17   your boat broke loose.  He decided at 9:00 that night

18   when he got the call not to go down and secure the

19   vessel.

20           THE COURT:  What does that do to the issue of

21   due care?

22           MR. BOHONNON:  How did he know that the boat had

23   broken loose and floating?  How did he know that's not

24   before he hit the pier.

25           THE COURT:  Do you know that?

1              MR. BOHONNON:  I don't know that.  I don't know

2     if he does either.

3              THE COURT:  It was 11:00 at night and dark.

4     What good was he going to do at the water at that hour?

5              MR. BOHONNON:  There are lights.

6              THE COURT:  Was there still small craft warnings

7     out?

8              MR. BOHONNON:  I assume there were, yes.

9              THE COURT:  He makes a point that he couldn't

10    have.  That there was change in the weather.  I guess I

11    will press him to tell him where that evidence is.  And

12    that by the time there was a change in the weather,

13    advisories went out and there was no way to access his

14    boat so would a prudent person go out on the water

15    against small craft advisories?  I don't think so.

16             MR. BOHONNON:  It would depend on the conditions

17    in Black Rock Harbor at that time.

18             THE COURT:  The conditions were small craft

19    advisory warnings?

20             MR. BOHONNON:  I'm not being evasive but there

21    are times when people got out in that weather close to

22    the shore.  His boat was not far from the pier of Black

23    Rock Harbor.  I don't know if they have some sort of

24    jitney that goes back and forth that takes the boaters

25    out larger than a dingy.  It is not impossible for him to

1    have done that.

2            THE COURT:  Is it your position that the prudent

3    person, the standard of care here is that whenever

4    there's a storm, certain of the boat owners needs to

5    proceed promptly to the boat to check his lines?

6            MR. BOHONNON:  He needs to make sure if

7    additional lines are necessary, he should put additional

8    lines out.

9            THE COURT:  How does he know if additional lines

10   are necessary?

11           MR. BOHONNON:  If the forecast are such that it

12   is different than a normal.  Just a normal day.  Remember

13   Crowley's testimony was that he's an experienced,

14   seasoned boater.  He would know from his own experience

15   days that for instance the Yacht Club races weren't held.

16   There was too much weather.  He would make the boat

17   secure.

18           THE COURT:  But, sir, now I'm remembering why I

19   asked you the question about issue of fact with weather.

20   Your expert I think says the weather that day was

21   perfectly normal for this time of year.  And yet the

22   Harbor Master testified it was awful of bad.

23           MR. BOHONNON:  Normal occurrence of bad weather

24   for that time of year.  In other words, the snow storm we

25   had two weeks ago or two and a half weeks ago was an

1   unusual weather event, the kind of weather we experienced

2   on 10-25-08 was something we had experienced as

3   meteorologist Horn said.  Something we experienced

4   frequently in October.  We don't have that kind of storm

5   every October but it is not uncommon to see that kind of

6   water.

7           THE COURT:  Did anyone determine what actually

8   broke or didn't work that caused the boat to come free?

9   Was there a rope hanging off the bow of the boat?  Was

10  there no more buoy on the surface meaning something sunk

11  or detached?

12          MR. BOHONNON:  Your Honor is correct.  The line

13  in the bow going down to the pendent that went to the.

14          THE COURT:  I didn't know what pendent was.

15          MR. BOHONNON:  A floating.

16          MR. TISDALE:  That's the pendent.  That is the

17  pendent.  The pendent is the line, the rope that goes

18  from the boat to the mooring ball.

19          THE COURT:     The thing that floats on the

20  surface?

21          MR. TISDALE:  Correct.  Sometime there's not a

22  boat connected to it, this is dropped in the water, then

23  a little float you might call a pick up buoy or tall boy

24  that makes it easier for the boater to pick up.  This is

25  the pendent and this line is what broke.

1          THE COURT:  That line went from the floating

2     buoy to the boat?

3          MR. TISDALE:  It was 16 feet long and there are

4     two of them.  That's why they call them dual or twin

5     pendants.

6          THE COURT:  Why do they call a rope a pendant?

7          MR. TISDALE:  The same reason they call it a

8     line.

9          THE COURT:  It does approximate a line.

10          MR. TISDALE:  Only when a line goes from a

11     mooring to a boat is it a pendant.

12          THE COURT:  I believe that there's testimony in

13     the record that Crowley last visited his boat on the

14     Sunday before this incident before he went to Europe and

15     that all of his lines and all of his whatever was fine.

16     Why isn't that and if the weather that then happens on

17     the 25 isn't unusually bad, why doesn't that satisfy his

18     duty?

19          MR. BOHONNON:  Because he didn't go to check

20     when the weather was forecasted.  That was different than

21     what he experienced on the 19th.  He testified that the

22     last time he saw the vessel he was out for the

23     recreational sail and that could have been his calm and

24     clear a day as experienced prior to, you know, in that

25     summer.  Or early fall.

```
 1              THE COURT:  Do we know when there had last been
 2      winds of 30 to 35 miles per hour with gusts of 43.
 3              MR. BOHONNON:  I don't know that, no.
 4              THE COURT:  I believe I know the answer to this
 5      from your exhibits but you want to confirm it.  There's
 6      this whole issue I will get into the plaintiff about your
 7      dock and how long it was and the permit and everything.
 8      I gather the pier whatever is properly called is 320
 9      feet.
10              MR. BOHONNON:  Correct.
11              THE COURT:  What foot from the land side?  How
12      many feet out would I walk on the pier until I get to the
13      hole or the damage?
14              MR. BOHONNON:  Exactly on the land side.
15              THE COURT:  I don't know what that means.  Can
16      you tell me in feet?  Was it 250, 150?
17              MR. BOHONNON:  As you are standing on the land
18      and you take your first step out towards the water,
19      that's where the pier was struck so it was struck --
20              THE COURT:  How did the boat get up there?
21              MR. BOHONNON:  Higher water tossed and turned
22      and it ended up on land.
23              THE COURT:  I was struck by that.
24              So there's no damage to the pier from this boat
25      from the end of the pier, the 320 foot back to the 10th
```

1    foot or the 20th feet approximately.

2             MR. BOHONNON:  Approximately 30 pilings that go

3    up from the land out to where the pier, prior to the last

4    storm we had Irene ended.

5             THE COURT:  So it is about 10 feet of pier

6    roughly?

7             MR. BOHONNON:  More than that.  I would say it

8    is closer to 30 pilings times five, 150 feet, something

9    like that.

10            MR. TISDALE:  Measurements from the different

11   estimates range from 60 feet to 90 feet of damaged pier.

12   The rest from that point --

13            THE COURT:  From the 90th foot out?

14            MR. TISDALE:  Waterward.  It was untouched by

15   the Moondance.

16            THE COURT:  Let me turn to the pier.  Are you

17   claiming the full replacement cost?

18            MR. BOHONNON:  No.  Only the repair.  The

19   estimates that were gathered by the Costas right after

20   the accident happened were to repair the pier.  I do

21   agree that that is the measure of damages in the cases

22   that is the repairs.

23            THE COURT:  All right.  I thought that one of

24   the estimates that was in the record was basically to

25   rebuild the whole thing.  Did I misunderstand that?

1    MR. BOHONNON:  No.  Your Honor's correct and

2    this may be more argument than your Honor wants but

3    Exhibit D and Exhibit G from plaintiff's cross motion for

4    judgment had their two experts Mr. Staffard and

5    Mr. Gardella differing completely as to what needs to be

6    done.

7    THE COURT:  The numbers are quite different.

8    MR. BOHONNON:  Not only the number is different

9    but Mr. Staffard said no builder would take the task to

10   repair and Gardella in his first estimate which is before

11   Staffard's report said I will repair it for $76,000.

12   Then he comes back and reforms that estimate with the

13   prior letter dated after Mr. Staffard's report, saying I

14   will do the whole thing but only do the whole thing and

15   do it for $240,000.

16   THE COURT:  Have you sought permits to permit

17   the repair of the pier?

18   MR. BOHONNON:  Yes.  From the DEP.  The Costas

19   have hired an expert John Gills whose deposition was

20   taken.  I've spoken to him on Monday and the status of

21   the permits are we're waiting for the DEP to give us the

22   permits.  Anecdotally he said that he believes the

23   permits will be forthcoming and they will be permitted to

24   replace the pier for the full 320 foot length.  That's

25   what he thinks is going to happen based on his --

1        THE COURT:  Is that what the plan of Costa is is

2   to replace the whole of it even though you just

3   acknowledged it is the repair of the broken part?

4        MR. BOHONNON:  No.  He's going to repair.  We're

5   seeking damages for repairs.  Irene has destroyed most of

6   the pier that was left but their intent is to put it back

7   to the unapproved length of 320.  That's what he's

8   applied for and his anecdotally he told us, he

9   represented that he believes it will be approved.

10        THE COURT:  Thank you very much, sir.  I will

11   turn to Attorney Tisdale.  I would like to start with the

12   limitation of liability issue because I'm completely

13   confused.  I don't understand how you bring a declaratory

14   judgment.

15        MR. TISDALE:  Well, Judge, as part of the

16   limitation of Liability Act as party can bring his own

17   action to seek to limit liability.

18        THE COURT:  That's what I have seen.

19        MR. TISDALE:  And also seek exoneration.

20        THE COURT:  Right.

21        MR. TISDALE:  We brought this as a declaratory

22   judgment case for exoneration initially for a couple of

23   reasons.  Not the least of which is we don't need to

24   bring a limitation action because there's only one

25   claimant.  When you file a limitation action, one of the

1   purposes behind the limitation action, Judge, is that you

2   get a concurses of all pending cases.

3         THE COURT:  You get all the other cases shut

4   down and brought into one but the other benefit of this

5   action is that it limits your damages.  You do certain

6   things.  You put in a surety amount of the value of the

7   boat.  You say, okay, this is all you are getting whether

8   it is one person or 50 people.

9         MR. TISDALE:  We have already bonded.  The

10  plaintiff.

11        THE COURT:  Did I miss that somewhere?

12        MR. TISDALE:  It is not in the pleadings.  They

13  put a lien on the boat.

14        THE COURT:  That's fine.  I'm wondering how you

15  sold it.

16        MR. TISDALE:  What we were trying to avoid is

17  having to bond it twice, number one; number two,

18  limitation can also be raised as an affirmative defense.

19  In that case you don't need to bond it so that's

20  effectively what we have done but we brought it first as

21  an exoneration declaratory judgment action seeking an

22  order saying that we took all reasonable actions and

23  therefore, should be exonerated from any liability.

24        THE COURT:  What do you rely on for the position

25  when it is an affirmative defense you don't need to

1    provide surety.  Deep Sea Tankers.

2              MR. TISDALE:  I think the rules themselves, Rule

3    C or supplemental admiralty Rule E.

4              THE COURT:  Okay.

5              MR. TISDALE:  I believe --

6              THE COURT:  But then --

7              MR. TISDALE:  Does not require.

8              THE COURT:  I still don't understand.  Why you

9    bring it as a declaratory judgment instead of a

10   Limitation of Liability Act.

11             MR. TISDALE:  We are asking for similar relief.

12   We're trying to avoid arguments that can be made from

13   time to time that say a limitation action should be

14   dismissed because there's only one claimant.  We were

15   trying to the follow the case in federal court

16   jurisdiction by bringing declaratory judgment action

17   under admiralty for exoneration and limitation as well as

18   these other issues but there's case law to the effect

19   that if and when there's only one claimant that

20   limitation action may not be appropriate.

21             THE COURT:  Can you tell me a case that would

22   support that position?

23             MR. TISDALE:  I would say, your Honor, there's

24   Supreme Court Louis and Clark.  Louis versus Louis and

25   Clark and Justice O'Connor gives a very long discussion

1    about it but what happened in that case, somebody stayed

2    a case in state court and the court ultimately stayed the

3    limitation case and that allowed the state court case to

4    go ahead.

5          But in that case, Justice O'Connor talks about

6    the fact that limitation has two purposes.  Filing a

7    limitation action as distinct from the limitation

8    defense.  Filing a limitation action is supposed to have

9    two procedural benefits.  One is the concursus and one is

10    monition.  One is the injunction against the prosecution

11    of any cases and anybody seeking injunctive relief and

12    the second benefit is that you get the concursus.  All of

13    the cases come into one court.  If there's no reason for

14    those procedural safeguards as they would not be in this

15    case because, number one, you already secured them and

16    number two, there's only one claimant so we don't need

17    the concursus.  Then the court -- it would be appropriate

18    if this court so chose to stay the litigation if the

19    state court case has been filed.

20          THE COURT:  How can you prevail on your First

21    and Fourth Count?  That is a declaratory judgment for

22    exoneration and limitations, if you haven't complied with

23    F, whatever the admiralty rules are.  You have told me

24    you have a security but it is not posted at court.  I

25    don't know if you meet the six month rule.  I'm not sure

1    what else could be a problem.

2            MR. TISDALE:  For all of those cases, your

3    Honor, well, let me back up.  As soon as the -- when the

4    plaintiff -- I will strike.  I will stop using plaintiff

5    and defendant.  When Mr. Costa asserted his counterclaim,

6    at that point now we had an affirmative claim by

7    Mr. Costa.  We raised affirmative defenses, exoneration,

8    limitation.  We can at any time raise exoneration or

9    limitation and we don't have to comply with the six month

10   rule and we don't have to put up a bond.

11           THE COURT:  Why not?

12           MR. TISDALE:  Because the rule so provide.

13           THE COURT:  Where?

14           MR. TISDALE:  If your Honor can hang on one

15   second.  I do have a case that talks about Second Circuit

16   does not require.

17           THE COURT:  There's clear Second Circuit cases

18   that say if it is an affirmative defense.

19           MR. TISDALE:  That's who we have done.

20           THE COURT:  I'm asking you how do you prevail on

21   your Count One and Count Four.  Not on your affirmative

22   defense.  I'm talking about how will you prevail on those

23   two counts.

24           MR. TISDALE:  Your Honor, I believe that based

25   upon -- let me say it this way.  We would strike Counts

1    One and Four and keep the limitation and exoneration as

2    affirmative defenses.  We are exactly in the same

3    places.

4              THE COURT:  That's fine.  We'll deal with it

5    then at the end of the case.

6              MR. TISDALE:  We're entirely in the same place

7    procedurally.

8              THE COURT:  I will take a moment and divert from

9    you and ask Attorney Bohonnon, do you agree with that?

10             MR. BOHONNON:  Fine.

11             THE COURT:  I will not worry about it anymore.

12   Apparently the Costa motion was not filed with all the

13   exhibits.  That's not an issue, right?

14             MR. TISDALE:  Not an issue.

15             THE COURT:  Let me start with the basics on the

16   liability.  Who bears the burden of proof?

17             MR. TISDALE:  What I will -- let me just.  I

18   would agree with Mr. Bohonnon to the point.  The

19   Louisiana removal shifts that the burden to me as the

20   vessel owner because our boat broke free, a moving

21   object, stationary objection, presumption of liability.

22   That shifts the burden of, persuasion not the burden of

23   proof.  That's Delta Trans load versus Navious 818 F2d

24   445.  That's the Fifth Circuit.  But I think you will

25   find that problem  Zerega 571 F.3d 206 says the same

1    thing I believe.  I can't say with it certainty about

2    Zerega.  What happens at that point is that I know have

3    to come forward with evidence to show why I should be --

4    why I satisfied that burden.  I can do it one of three

5    ways.

6            THE COURT:  You have to show that you weren't

7    negligent.

8            MR. TISDALE:  I think I have to show the station

9    object did somehow or the circumstances were so

10   unexplainable.

11           THE COURT:  Act of God.

12           MR. TISDALE:  Act of God type thing or number

13   three, we weren't negligent.  That's effectively what

14   we're showing here, Judge.  We did everything a

15   reasonably prudent boat owner would do.

16           THE COURT:  Well, Attorney Bohonnon says no, you

17   didn't.  You last checked the line on bounty Sunday and

18   no one checked them when the storm was forecasted.

19           MR. TISDALE:  The evidence, Judge, that's --

20   first of all, let's talk about the storm for just a

21   second because I think that's about as big a red herring

22   that we have in the case.  The forecast right up until

23   Saturday at 4:00 and this isn't my --

24           THE COURT:  Can you tell me where I will find

25   this in the record.

1          MR. TISDALE:  His expert's report.

2          THE COURT:  Okay.

3          MR. TISDALE:  His expert goes through it in

4     great detail.  What's not appended is the actual National

5     Weather Service Forecast which show the time and place

6     and forecast at that time.  He appended that to his

7     report.  It is about 200 pages long.  You don't need it.

8     He summarizes it.  Up until 4:00, they are forecasting 10

9     to 15 or 15 to 20 with gusts to 30.  Very expectable

10    weather at that time of year.

11         THE COURT:  But is it weather that you need to

12    guard against?  In other words, the fact that the weather

13    is expected, it doesn't mean that it isn't weather that

14    you need to take precautions.

15         MR. TISDALE:  In fact, we had taken precaution

16    at the beginning of the season and throughout the season

17    and that's what Mrs. Billings has testified to and that's

18    the fact that Mr. Scinto testified to.

19         THE COURT:  Isn't there sort of a rule of thumb

20    on duty of care, when there's a forecast of weather.  20

21    miles per hour winds it doesn't blow 20 miles and hour

22    every day in October around here from my recollection.

23    When you get weather like that you should go check your

24    lines again.

25         MR. TISDALE:  The weather that was forecasted

1    was not outrageous or unusual.

2            THE COURT:  Had there been gusts of 30 on

3    Monday, Tuesday, Wednesday through Friday?

4            MR. TISDALE:  I'm sure the weather records that

5    Mr. Horn provided would show that.  Throughout that

6    season there were numerous dates where there were gusts

7    up to 30 miles per hour.

8            THE COURT:  Is that in the record?

9            MR. TISDALE:  That's not in the record, Judge.

10   Let me say this.  The equipment that this boat was moored

11   with and let's pay particular attention to these

12   pendants.  These pendants are three quarter inch Dacron.

13   Brand new that year.  They are expected to last a minimum

14   two years, often five years.

15           THE COURT:  I thought you said minimum one

16   year.

17           MR. TISDALE:  No.  Mr. Billings' testimony is

18   the only testimony on the point is that I often replace

19   them in two years but they can get four to five.  But I

20   have never replaced them in less than two years.  On top

21   of this line is material called chaffing gear which looks

22   like a fire hose and that chaffing gear and this line

23   goes through a metal fitting called a chock and when

24   Mr. Crowley saw this pendant and that chaffing gear on

25   October 19, the week before, all of it was in nearly new

1      condition.

2              THE COURT:  Could he see the line?

3              MR. TISDALE:  He had to.  He pulled it up.

4              THE COURT:  With the chaffing gear around it,

5      how do you see the condition of the rope?

6              MR. TISDALE:  You wouldn't see the condition of

7      the rope.  What happens is it wears and chaffing gear

8      gets on it.  That's why you have chaffing gear on it.  It

9      is like a cover on the book.

10             THE COURT:  I understand what you are saying.

11     I'm not sure it is necessarily true.

12             MR. TISDALE:  I don't think anybody would

13     dispute.

14             THE COURT:  That rope can only severed by

15     something rubbing on it?

16             MR. TISDALE:  Unless there was a force that was

17     so great that caused it to snap which would take an

18     extraordinary load.  Nothing like we have seen here.

19     Judge.  I could pull a truck, an eighteen wheeler with

20     this.

21             THE COURT:  Why did that break?

22             MR. TISDALE:  Apparently it wore and chaffed all

23     the way through, through the chaffing gear and through

24     this line at that chock.

25             THE COURT:  During this storm?

1              MR. TISDALE:  During this storm.

2              THE COURT:  Not before.

3              MR. TISDALE:  Never.

4              THE COURT:  That rope that could happen in that

5       short a period of time?

6              MR. TISDALE:  And believe me the only one more

7       shocked than you was Mr. Crowley who spent $500 for

8       what's effectively 30 feet of rope.  You pay that money

9       because you expect that that boat is going to keep you

10      secured to your mooring and that's what Mr. Billings and

11      Mr. Scinto have both said.  Mr. Billings inspected that

12      mooring that year as did the then Harbor Master.  That's

13      Mr. Billings' testimony.  I expected it.  I insisted that

14      Mr. Crowley get a new pendant.  Mr. Billing was the one

15      who bought the pendant.  He installed it and from that

16      point forward that was what was used to affix the boat.

17      Both Mr. Billings and Mr. Scinto say that with that

18      equipment I would have expected this boat to have been

19      adequately and safely secured throughout the season

20      period in all of the expected weather.  For that -- for

21      the season period.

22             THE COURT:  I'm having trouble with I think your

23      argument is that up to 4:00, the forecast was, you know,

24      not bad weather.  I'm using layman phrases.  At 4:00, the

25      forecast changes.  The winds get up by 10 miles per hour

1    and that that weather was bad weather and by 11:00 --

2    9:00 that night that rope was worn through five hours of

3    rubbing in the storm that was only 10 miles stronger than

4    what was normal weather caused that to happen.  I'm

5    having trouble.

6         MR. TISDALE:  We're not seeking, as I mentioned

7    to your Honor, there are three ways to the address the

8    Louisiana rule.  One is about of God.  We're really not

9    working on the act of God.  We don't have a meteorologist

10   for a reason and that is because it is not just the wind

11   that effects what was happening on the Moondance and how

12   much wear was being forced on this.  For instance, it is

13   things like height of the tide.  If you have a much

14   higher tide, much greater stress.  Also the size of the

15   seas that are now facing it.  The fact that the wind come

16   from the south and southeast that day was unique and

17   extraordinary.  That's a problem in Black Rock Harbor

18   because it comes in like a funnel.  All of these factors

19   came together to cause a problem.

20        The reason I'm not going that way is because I

21   would spend way too much money on experts trying to

22   determine exactly what forces that boat was encountering

23   at that time that it could have worn through that

24   pendant.  It would have cost us -- I have hired

25   meteorologists 50 times in my life, never come out cheap.

1      We're not pushing that issue.

2              I read plaintiff not arguing that we didn't,

3      that it wasn't an act of God necessarily.  Their argument

4      is we should have done something more at that point once

5      the forecast got greater.

6              My point is at that point if you are saying that

7      up until that time, the weather was expectable, then I

8      would say to you we satisfied our burden of proof of

9      reasonable care because everybody who saw this and

10     inspected this, says this was in the condition would have

11     been appropriate to have taken care of all expected

12     weather.  But they are arguing then that come 4:00, you

13     should have done something else.  Now they haven't said

14     what else.

15             THE COURT:  He said.  He said you could have

16     gone out in some sort of boat other than a small craft

17     and checked the line when you knew the weather was

18     turning back.

19             MR. TISDALE:  Mr. Billings is the one who

20     testified by the morning it was too late.  By the morning

21     before.

22             THE COURT:  How could that be if the forecast

23     didn't change until 4:00.  How could it be too bad in the

24     morning, the next morning?

25             MR. TISDALE:  That morning was not a good day.

1    We have a number of not good days in Bridgeport.  They

2    are not unusual but they close the launch service if it

3    is that bad.

4         THE COURT:  Did Billings testify they closed the

5    launch service?

6         MR. TISDALE:  He said he didn't go out that day

7    to look at boats.  No one was going out that day.

8         THE COURT:  It was a Thursday or Friday.

9         MR. TISDALE:  It was a Saturday but his

10   testimony was by that time in the morning it was too

11   late.  Now but there isn't anything that --

12        THE COURT:  Let see if I understand that in very

13   simple terms.  He's saying that in the morning there was

14   already bad weather in Black Rock Harbor so doesn't that

15   tell me that somebody should have gone and checked their

16   line the day before because that bad weather was coming.

17   If it is bad enough that you can't go out to the boat and

18   I presume that was the forecast, not as bad as the 4:00

19   forecast, whatever was bad enough to keep people off the

20   water in the morning, would have told a prudent person

21   the day before go out and check your line, no?

22        MR. TISDALE:  If you leave your home and go away

23   on vacation for a week, you turn your heat down and

24   prepare your house for you to be away in the wintertime

25   and it gets a cold snap.  You say that's okay my house is

1   covered for the cold snap.  No big deal.  Instead of

2   going to zero, goes to minus 20 you prepared for 20.

3   Minus 20.  Pipes start to break.  When you heard at 4:00

4   in the afternoon while we were off on vacation that there

5   was going to be a cold snap at 6:00, you didn't do

6   anything about it.  That's effectively what we're saying

7   here.  You were prepared for the expectable weather.  Mr.

8   Crowley was  prepared for the expected weather Mr. Scinto

9   said that.  Mr. Billings said that.  The weather that was

10  forecast was expectable weather.  It wasn't good.  It

11  wasn't like you were going to go out and have a good sail

12  that day.  It was blowing.  It is just not fun.  Doesn't

13  mean your boat is in danger.  That's why you spend $500

14  for a pendant.  That's why your Honor put insulation in

15  your house.  Not to cover the minus 20 temperature but

16  the expectable occasional zero.  That's what he did here.

17  He did everything a reasonably prudent boat owner would

18  do.

19          THE COURT:  Why do I see all this reference to

20  checking the lines?  What you argued would say to me he

21  could have put his boat in the water in May, bought his

22  $500 pendant and had Billings look at it and say

23  everything is fine or install it and leave the boat there

24  from then and until November, and he would have satisfied

25  a duty of care.

1          MR. TISDALE:  I wouldn't say that, Judge.  I
2     would say that you have a duty to occasionally reasonably
3     inspect your boat.  That's what, for instance, there's a
4     decision called Neraida that I think I have cited in our
5     brief, Judge.  That's 508 F.3d D 586.  They talk about
6     this is a 65 foot boat that the court talks about the
7     fact that the owner of the boat lived 500 miles away from
8     the boat.  He had somebody inspect it once a week.  That
9     was adequate.  There isn't any evidence that you have to
10     be at your boat every second of your day.  Just like you
11     don't have to be at your house every second of every day.
12          THE COURT:  Other than Vermont after Irene,
13     generally my house doesn't go anywhere and hit something
14     which I think is the reason why I think we have duties of
15     care with respect to mooring boats because they do break
16     loose.
17          I want to turn to the issue of the pier.  Really
18     your summary judgment argument.  As I understand it, you
19     basically are relying on the Connecticut decision Ertel
20     versus Rock.  Is that a fair statement?
21          MR. TISDALE:  That's fair statement.
22          THE COURT:  The facts in that case, actually the
23     holding in that case, the holding relies in my reading of
24     it.  I will give you a chance to tell me I'm misreading
25     it but the holding in it -- the end of the appellate

1    court decision it says the court concluded that "The

2    plaintiffs do not have a property right on the dock,

3    they're quoting a lower court case -- in the dock that he

4    was ordered to remove because the dock that the plaintiff

5    instructed did not at any time conform to the permit."

6    And then the court concludes we conclude the plaintiff's

7    taking claim cannot be maintained.  He's not able to

8    demonstrate the property interest wasn't involved.

9    Doesn't that case turn on the fact that of what the facts

10   were which was a 25-year-old battle including a final

11   ultimate get this pier down.  If there hasn't -- if it

12   had been this pier that's at issue here but I don't know

13   of any order to remove this pier.  I have a statement by

14   someone.  Well, you might want to argue it is not

15   admissible but you didn't move in limine or strike it his

16   expert who is processing the DEP permit saying that he

17   expects the permit will be granted.  I don't understand

18   how you can argue Ertel supports you.

19             MR. TISDALE:  I think it is simple, Judge.  At

20   the time the movant struck Mr. Costa's pier, that pier

21   had no permit.  It was granted permit for 160 feet.  And

22   he instead took -- he stole 160 feet more of water front

23   and he built his dock all the way around because had he

24   built 160 foot dock, it would have been worthless.  Ends

25   on the mud flaps.  It is worthless as a pier.  There's no

```
1    water there half the day.  But he took it.  Now it
2    wasn't -- no one complained about it and no one ordered.
3    No one went to the DEP to say order him to remove it
4    which the DEP could have done and had authority to do had
5    it been brought to their attention.  They didn't know it
6    until this accident happened that there was in fact --
7              THE COURT:  Why hasn't the DEP denied the permit
8    application for the 320 feet?
9              MR. TISDALE:  They haven't granted it yet.
10   Here's what they are doing.  In order to get the 320 foot
11   dock, Mr. Costa has to agree that this dock will be
12   available to property owners on three adjoining or other
13   pieces on the property, other parcels, and no one else on
14   those parcels will build their own dock.  He has a grant
15   for the restriction.  We don't know if that's going to be
16   granted or not honestly.
17             THE COURT:  We do know that Mr. Costa was
18   joyfully enjoying his 320 foot dock without any
19   interference from DEP or anybody else when your boat
20   struck it.  Your argument would require me to conclude
21   that whenever anybody constructs something.  For example,
22   let's say I owned a house on the edge of Black Rock
23   Harbor and I added a sun porch that encroached on the
24   side line requirements of the zoning laws so it was not
25   nonconforming.  It was in violation of the zoning laws so
```

1    I had no permit to put it there a foot over the line.

2    And your boat up in does what it did and lands in my

3    front yard and takes out my sun porch, you wouldn't have

4    to pay for my sun porch?  I don't understand it means

5    basically that boats with impunity can be flying around

6    the harbor and nearby land areas as long as they did

7    something that's not permitted properly, there's no

8    damage?

9            MR. TISDALE:  I don't think that's necessarily

10   the law.  I also don't think it is appropriate for people

11   to take property with impunity, then be rewarded for it

12   when it is ultimately damaged.  If he stole a boat and we

13   hit the boat just because he had done some improvements

14   on the boat we struck, we wouldn't reimburse him for the

15   improvements he did on the boat that he stole.

16           THE COURT:  Does it matter that Moondance struck

17   the part of his pier that was permitted?

18           MR. TISDALE:  Only in the fact that had he

19   struck or had he built only 160 foot pier, it would have

20   been a pier that had no value.

21           THE COURT:  That's not your judgment.  You can't

22   make that judgment.  If I choose to build a pier that I

23   could only use at high tide but I like to go walk out a

24   pier like a deck almost and have access and swim off of

25   at high tide or boat off of it at high tide.  That's my

1    choice.  If you damage it.  The fact that it may not have

2    as much value to people because it is not always

3    accessible doesn't mean it doesn't cost a certain amount

4    to repair.

5            MR. TISDALE:  I'm basing that, Judge, on the

6    testimony of their expert Mr. Little who said 150 foot

7    dock would be worthless.

8            THE COURT:  I'm not sure -- there's lots of ways

9    the word worthless can be used but anyway.  I have

10   exhausted my questions.

11           MR. TISDALE:  One point that I don't think we

12   have touched upon is the issue also of depreciation.  And

13   that the rule, the rule of maritime law insofar as

14   property damage is concerned is you get what you had when

15   it was damaged and especially in the case of piers and

16   docks, a depreciation allowance has to be put into

17   place.

18           THE COURT:  Am I doing that on the summary

19   judgment?

20           MR. TISDALE:  First of all, Judge, I don't think

21   you can grant summary judgment in any way, shape or form

22   with the exception perhaps of Crowley's motion on the

23   law, the fact that this is an illegal dock.  There's no

24   dispute of that.  Everything else there's a factual

25   dispute.  There are so many general issues on material

1    fact here, Judge, I would be hard pressed to find a case

2    that had more than this in 31 years of handling maritime

3    cases every issue has a fact.  We will require a trial

4    before your Honor.  One of those facts is if for some

5    change we're not exonerated, not limited, the court finds

6    the plaintiff did suffer property damage, the value of

7    that damage has to be depreciated by the actual condition

8    of that dock at the time it was damaged. There are two

9    opinions as to depreciation.  One is from Mr. Truslow

10   that's 90 percent.

11           THE COURT:  What's the case law that says

12   depreciation is the value?

13           MR. TISDALE:  American Oil Company versus Lacon

14   398 F. Supp 1181.  Brooklyn Waterfront Terminal 211

15   F.Supp 702 affirmed 311 F.2d, 221, then there are other

16   cases decided -- listed in that.  The two -- the only two

17   comments we have about the depreciated value of this

18   pier.  As you know a pier has been knocked done almost

19   fully as a result of Irene.  Had nothing to do with being

20   previously struck by Moondance.  But the only two

21   people -- person who actually saw what was remaining

22   because nobody has given an estimate of the cost of

23   repairs given any depreciation allowance, the Blakelee

24   bid which is the one your Honor was referring to, talks

25   about replacing 30 pilings but then talks about all 320

1    feet of the pier is what they are going to replace.  That

2    wasn't damaged by Moondance but it needs to be replaced

3    at that time because it was in bad condition.  The only

4    person who came and saw the existence of the conditions,

5    pilings and things out at the 90 foot mark was

6    Mr. Gardella will because he lifted the Moondance off the

7    shore with his barge and crane, and he's also a dock

8    builder.  He was comment was I will not.  I would not

9    repair it because the rest of it is in such bad

10   condition, I would only replace it.

11              THE COURT:  If you hit my automobile and you

12   cause $4000 damage to my automobile.  I may be driving a

13   1970 Volvo that has a book value of $30 but if it cost

14   $4000 to repair it, don't you have to pay me.  Do you get

15   to say it is only worth $20 on the blue book value, I

16   will pay you $20.

17              MR. TISDALE:  I think actually the law is such

18   if the cost of repair exceeds the value of the product,

19   it is constructive total loss.

20              THE COURT:  Is depreciation the measure of the

21   value of the product?  Isn't the value of the product

22   something a real estate a agent or appraiser might opine

23   on?

24              MR. TISDALE:  The difference between your car

25   and this pier, Judge, if they replace ninety feet of the

1    pier then go forward and replace the rest, they have 100

2    benefit of what we just replaced whereas with your car,

3    if I replace your fender, you are not going take your

4    fender home and do something else to it.  If you want to

5    get a new car or do something else, your fender has no

6    more value.

7          MR. TISDALE:  If they add on to this, then you

8    have to look and say what was the actual condition.  Was

9    the dock owner entitled to be made whole to the damage of

10   the pier as existed at the time of collision.  Plaintiff

11   is not entitled to a new pier or a new portion thereof.

12   In computing damage for replacement of repair, deduction

13   for depreciation is made with few exceptions.  The only

14   exceptions are when the pieces that are being repaired

15   are not severable.

16         THE COURT:  I ask again, on the summary judgment

17   I don't really see that I'm going to address an issue of

18   depreciation or not depreciation but --

19         MR. TISDALE:  Only because the plaintiff has

20   moved for 325,000 in damages that we bring up.

21         THE COURT:  He also moved for summary judgment

22   on liability.  I don't have to decide damages.

23         MR. TISDALE:  It wasn't just liability.  He

24   moved for both.

25         THE COURT:  I understand.  All right.  I will

1    take it under advisement.

2              (Whereupon, the above hearing concluded at 1:10

3    p.m.)

4

5

6

7

8

9    COURT REPORTER'S TRANSCRIPT CERTIFICATE

10   I hereby certify that the within and foregoing is a true

11   and correct transcript taken from the proceedings in the

12   above-entitled matter.

13

14   /s/  Terri Fidanza

15   Terri Fidanza, RPR

16   Official Court Reporter

17

18

19

20

21

22

23

24

25