UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| CLIFF CROWLEY ET AL., | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:09-CV-1991 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CHARLES J. COSTA ET AL., | : | FEBRUARY 14, 2013 |
| Defendants. | : | |
| | : | |

**BENCH TRIAL RULING**

I.    **INTRODUCTION**

Plaintiffs Cliff Crowley ("Crowley"), as the owner of the yacht "Moondance," and

the New Hampshire Insurance Company (collectively, "plaintiffs") brought this admiralty

and maritime action against defendants Angelo Costa[1] and Charles J. Costa, trustee of

the Angelo P. Costa Revocable Trust ("Costa").  Crowley sought declaratory judgment

on four counts regarding his liability for damage to Costa's pier caused by the

Moondance when it broke from its mooring during a storm.  Costa counterclaimed that

the damage to his pier was caused by Crowley's "acts, omissions, strict liability, fault,

negligence, and breach of federal safety and operating regulations."  Defs.' Answer to

Verified Compl. and Counterclaims (Doc. No. 18) ("Defs.' Answer") at 5-6.

The plaintiffs' Complaint is in four counts: the first is for exoneration of their

liability; the second and third are for declaratory judgment as to the value of Costa's

pier; the fourth is for limitation of the plaintiffs' liability.  See Am. Compl. (Doc. No. 10).

The court dismissed Counts One and Four on April 26, 2012 (Doc. No. 87) and

---

[1] The court granted Costa's Motion to Substitute Defendant (Doc. No. 109), which replaced
Angelo Costa with Attorney Margaret E. Sullivan, Temporary Administratix c.t.a. of the Estate of Angelo P.
Costa, deceased and Temporary Successor Trustee of the Angelo P. Costa Revocable Trust.  The court
will refer to the Administratix party as "Costa."

converted (without objection) Counts Two and Three into affirmative defenses to

Costa's counterclaim for damages.  See (Doc. No. 99).  Therefore, the remaining cause

of action consists of Costa's counterclaim for damage to the pier caused by Crowley's

conduct.

The plaintiffs assert three affirmative defenses to the counterclaim: failure to

state a cause of action; they were not responsible for the loss; and their liability was

limited to the value of the Moondance.[2]  Plaintiffs/Counterclaim Defendants' Answer to

Defendants' Counterclaim (Doc. No. 31) at 2.  The court held a bench trial in this matter

on September 11-12, and 24, and October 23, 2012, and oral argument on January 15,

2013.

## II.    FINDINGS OF FACT[3]

A.  Background

On October 25, 2008, the Moondance struck the pier on Angelo Costa's property,

located at 98 Grovers Avenue, Bridgeport, CT.  The Moondance, a 44 foot Swan

sailboat, belonged to Cliff Crowley.  Costa's pier measured 320 feet in length and was

built in 1957.  Costa's permit, however, only permitted Costa to construct a 160 foot

pier.  Angelo Costa periodically repaired the pier, spending approximately $50,000 on

repairs between 1976 and 1996.  In addition, until early 2000, Costa employed a man to

undertake various upkeep and repairs around the house, including to the dock.  He

_____

[2] The plaintiffs originally asserted an additional affirmative defense, that "any loss or damage sustained by the Defendants was proximately caused by a peril of the sea or Act of God."  Answer to Def.'s Counterclaim at 2.   However, at the pre-trial conference, plaintiffs' attorney, Mr. Tisdale, stated that, "we're not pursuing the act of god defense."  See Hearing Transcript 6/29/2012 (Doc. No. 103), at 49.

[3] The court has sought to separate out its findings of fact from its conclusions of law.  However, there may be occasions when findings of fact are intertwined with the legal discussion in the conclusions of law.

performed such tasks as replacing handrails or wooden decking, but he did not replace any of the large timbers or stringers.

Crowley has been a member of Black Rock Yacht Club since 1994.  He purchased the Moondance in 2005, and kept it moored in Black Rock Harbor, which is in the western portion of the Long Island Sound.  Typically, he would keep the Moondance in the water from April to November each year.  In the wintertime, Crowley would store the boar at Captain Cove Seaport in Bridgeport or Jamestown Boatyard in Rhode Island.  If foul weather was expected, Crowley would move the boat to a more secure location alongside the dock at Captain Cove Seaport.  In 2008, the Moondance's mooring was placed on the eastside of the channel just off Fairweather Island, directly across from the Black Rock Yacht Club dock (approximately one quarter of a mile away).  Crowley did not decide to place the Moondance in this location.  Rather, Ed Billings, the club manager and former shore captain at Black Rock Yacht Club, made that decision.  In 2008, Mr. Billings placed the Moondance on its moorings and performed an inspection of the moorings.

The Moondance was attached to its mooring by an 800 pound mushroom anchor connected by two links of chain to a mooring ball—the top chain was one half inch, the bottom chain five-eighths of an inch.  The City of Bridgeport Harbormaster Mooring Rules and Regulations sets forth minimum requirements for mooring tackle, which the Moondance moorings met except for the top and bottom chains.  The regulations seek to minimize or prevent the occurrence of vessels breaking free of their moorings.

Vessels do break free of their moorings.  Boats break free of their moorings when there is constant rubbing through the chock,[4] causing the pennants to wear and break.

The Rules and Regulations set forth a minimum requirement of three-quarter inch top and bottom chain for a 41 to 50 foot long boat.  The Moondance had a five-eighths inch bottom chain because, according to Mr. Billings, a heavier chain "will wrap around the mushroom anchor, thereby eliminating proper scope of the chain . . . with a slightly lighter weight chain on the bottom, it would enable the boat to fully use the entire anchor system."  Transcript of Bench Trial Proceedings (hereinafter "Trial Tr.") at 389/25-390/1-3.[5]  From the mooring ball, the boat was attached by two pennants[6]—which are ropes or boaters mooring lines through a chock.

Mr. Billings suggested that Crowley replace some parts of the mooring system chain.  Thereafter, Crowley purchased two new pennants, shackles, and a new section of chain which is typically replaced every two or three years.  After purchasing the new mooring equipment, during the 2008 season, Crowley did not see any unusual wear on the pennants or chafing gear.  When Mr. Billings's installed the pennants, there was chafing gear on the pennants.

On Sunday, October 19, 2008, Crowley went sailing on the Moondance.  Later that same day, he left town for a six day business trip to London and Geneva.  When he

---

[4] A chock is a device that keeps the line from moving around the deck.

[5] Citation to the Trial Transcript will be in the format, page/line.

[6] Chris Ruskay, the owner-operator of the Fayerweather Boatyard, testified that he only saw one pennant on the Moondance after the accident on Sunday, October 26, 2008.  However, photographs 50 and 51 of Exhibit 208 show pennants in two different places on the boat.  Photographs 60 and 61 each show a yellow pennant, but the one in photograph 60 has a blue string—used to hold the cleat in place—that matches the one found on Exhibit 1, the pennant retrieved from the Moondance, while the one in photograph 61 has a longer blue string than the one found on the Exhibit 1 pennant.  Therefore, the court finds that the Moondance was affixed with two pennant at the time of the allision.

travels, Crowley generally monitors the weather at home.  However, Crowley did not monitor the weather during the week in question.[7]  If Crowley is concerned about the weather while he is away, he asks his wife, Mr. Billings, or a friend to keep an eye on the boat.  Another boat owner could have gained access to the Moondance by obtaining the combination lock code.  Because it takes only five minutes to take the launch from Black Black Rock Yacht Club to where the Moondance was moored, and Crowley has moved other boat owners' boats for them when they were away, it would not be difficult for Crowley to have someone move his boat for him while he was away.

Mr. Billings had no recollection of Crowley telling him that he was going out of town.  Crowley failed to tell Mr. Billings he was going out of town on Sunday, October 19, 2008.  Further, Crowley never contacted Mr. Billings, or anyone else, once forecasters predicted the storm on Wednesday and Thursday.  Crowley was not concerned about the weather while he was away.

Crowley returned on the evening of Saturday, October 25, 2008, to John F. Kennedy Airport.  When he landed, his wife informed him that the Fleet Captain at Black Rock Yacht Club called to say the Moondance broke off its mooring.  The boat broke free because the lines chafed through on the chocks because of the constant rubbing through the chock as the boat moved side to side and up and down.  After the boat broke free, it proceeded down the harbor, and it hit Costa's pier in three places, including toward the water's end of the dock as well as near the land's end, where the boat ultimately rested.  A 90 to 100 foot section of the pier, closest to the land, was destroyed.  The pilings had snapped and/or cracked, the decking was totally gone, and

---

[7] Crowley testified that he monitored the weather during the week in question, but did not notice anything to cause him concern, despite the forecasts, see infra, pp. 6-9.  The court does not credit this.

the boat was sitting just about where the beginning of the pier on the land side would have been.

Crowley went to Costa's property on Sunday, October 26, to observe the boat. Crowley did not remove the sail from his boat in advance of the storm and no chafing gear was present after the boat hit the dock.  However, the Moondance had chafing gear on its pennants prior to the October 25 storm.

Crowley contracted with Norwalk Marine Contractors ("Norwalk Marine") to lift the boat up, pull it out of the water, and take it to Captain Cove Seaport.  Norwalk Marine used a crane barge to lift the boat, but the barge dropped the vessel on a shoal and the vessel was grounded.  After several attempts to dislodge the vessel, the yacht club's workboat was able to work it free.

B.  The weather

Black Rock Harbor is most at risk when the winds are coming south to southeast because there is no break water at the mouth of the Harbor.  The wind can thus carry and build up waves over the entire distance from Long Island to Bridgeport.

On October 22, 2008, the Wednesday before the storm, the Weather Service Office based in New York—responsible for the marine forecast for Long Island Sound and surrounding coastal weather—forecasted that a storm was coming on the weekend. Potential gale force winds—meaning sustained or wind gusts of 39 to 54 miles per

hour—were forecasted on Wednesday for Saturday, Pl. Ex. 35, at 1.[8]  This forecast was available on National Oceanic and Atmospheric Administration weather radio, the Weather Channel, through local meteorologists, and on the internet.  Chris Ruskay knew in the days prior to October 25, 2008, that a storm was predicted.  Information about the storm was readily available to mariners.

On Thursday, October 23, the Weather Service Office continued to predict gale force conditions for Saturday, and, in particular, strengthening southeasterly flow, a cold front, and high pressure.  At 7:24 a.m. on Friday, October 24, the marine forecast stated it was "quiet before the storm through Saturday morning."  Id. at 1-2.  Although the forecast in the morning and at 1:41 p.m. on Friday predicted high winds over eastern waters, it still issued—at 7:24 a.m. on Friday—a gale watch over "all waters" beginning Saturday afternoon and into the evening.  See id. at 2.  By Friday night, October 24, at 8:27 p.m., the forecast for Black Rock Harbor was downgraded to a small craft advisory starting at noon Saturday, although the forecasts predicted the small craft advisory gusts would not commence until a couple of hours after.  See Pl. Ex. 35, at 3.

On the morning of Saturday, October 25, winds began to increase, although they were still under 20 miles per hour.  Trial Tr. at 224/10-11.  At 5:17 a.m., the forecast predicted winds from the south at 10 to 15 miles per hour with gusts up to 25 miles per

_____

[8] Although the plaintiffs attempted to discredit this forecast by having Art Horn admit that the summary forecast reflected in Plaintiffs' Exhibit 35 was for entire area covered by the Upton, NY, weather station, rather than only Black Rock Harbor, the court does not find this admission to undercut its finding. The summary differentiates between eastern and western waters where applicable and refers to "all waters" when forecasting for the entire coastal area.  Therefore, the court finds that the summary clearly indicates which forecast pertains to Black Rock Harbor, located in the western part of the Sound. Furthermore, the plaintiffs' weather expert, Trevor Bevens, confirmed that the forecast reflected in Plaintiffs' Exhibit 35 is accurate.  See Trial Tr. at 499/20-23.  He testified that, in the middle of the week, it was predicted that a storm was coming with the potential for gale force winds.  Therefore, the court credits the summary forecast reflected in Plaintiffs' Exhibit 35.

hour in the afternoon and evening.  Pl. Ex. 216, at 32.  The marine forecast predicted gusts reaching up to 34 miles per hour.  Pl. Ex. 35, at 4.

The defendant's weather expert utilized data from Sikorsky Airport to determine what weather was experienced on Saturday, October 25.  However, the plaintiffs' weather expert testified that the Sikorsky data does not accurately reflect the weather felt on the water because the wind is interrupted by trees, buildings, or obstacles near the airport, which slows it down.  Therefore, the court credits Mr. Bevens' testimony, as opposed to the data reflected in Defendant's Exhibit 216 from Sikorsky Airport.  The court finds, based on Mr. Beven's testimony, that on Saturday, October 25, the winds started to come from the dominant direction of south-southeast around noontime.  The winds also increased to above 20 miles per hour around noon as well.  The winds continued at that speed or higher for approximately 10 to 12 hours.  At 6:00 p.m., the winds were sustained at 36 miles per hour with gusts of 44 miles per hour.  At 7:00 p.m., the winds were sustained at 34 miles per hour with gusts of 44 miles per hour.  At 8:00 p.m., the winds were sustained at 35 miles per hour with gusts of 44 miles per hour.  At 9:00 p.m., the winds were sustained at 35 miles per hour with gusts of 45 miles per hour.  At 10:00 p.m., the winds were sustained at 32 miles per hour with gusts of 45 miles per hour.  The waves were under a foot in height throughout the morning, but they reached as high as three and a half feet in Black Rock Harbor during the height of the storm.  Based on Mr. Beven's testimony, the court finds that, by the time the National Weather Service issued a gale warning on Saturday, gale winds were already blowing.

The court finds, based on Mr. Horn's testimony, that every weather situation is different and some situations are easier to predict than others.  Based on Mr. Horn's

testimony as well as that of Mr. Bevens, the court finds that sometimes you can fine

tune a forecast the closer it gets to the event, but sometimes you make a better forecast

two or three days out.  Based on the exhibits and the testimony of Mr. Horn and Mr.

Bevens, the court finds that the best predictions of the storm that occurred on Saturday,

October 25, 2008, were reflected in the forecasts on Wednesday, Thursday, and to mid-

day Friday.

C.  Historical weather

October weather is typically quite variable.  The court credits Mr. Ruskay's

testimony that, over the 45 years he has been in the business, the most trouble he has

had has been with fall storms.  In addition, the court credits Mr. Scinto's testimony that

October is a difficult month in terms of weather and Mr. Bevens' testimony that the

weather in October can be variable.  There may be a few years of calm weather and,

then, a few years with big storms during the month.  Winds from the north are less

problematic for Black Rock Harbor because the harbor is protected from that direction.

If the winds come from the south, there is a greater chance of bigger waves

The court finds, based on Mr. Horn's testimony, that the storm on Saturday,

October 25, 2008, was not unique.  In 1996, there was a storm that lasted 26 hours,

with winds gusting as high as 54 miles per hour, and sustained winds of over 40 miles

per hour for many hours.  In addition, in 2006, a storm blew from the south for about 10

hours, although the winds were less than those experienced on October 25, 2008.[9]

---

[9] Although Mr. Bevens testified that the storm that took place on October 25, 2008, was unique
due to the length of the storm—11 hours— and the degree of sustained winds—20 miles per hour and
higher—the court does not credit his testimony.   In forming his opinion, Mr. Bevens limited his analysis to
weather patterns within a limited, ten year period (1997 to 2008).  He did so because of his view that
there were "holes" in the data prior to 1997.  Given the testimony that the weather in October is variable,
the court cannot conclude that a storm is unique based on historical data going back only ten years.

D.  Reasonable standard of care

When there is bad weather forecasted, boat owners at Black Rock Yacht Club secure loose canvas, tie up their sails, frequently remove the head sail or the jib which has a tendency to unravel, check the mooring gear, make sure the chafing gear is in place, or remove the boat.  Crowley has moved his boat to a more secure location down the harbor once or twice a season when foul weather was expected.  When bad weather is predicted, a boat owner should get his boat off the mooring and into a marina or more protected coverage.

E.  Condition of the Pier

The dock piles were deteriorated, and they showed signs of hourglassing, marine growth, and heavy cracking.  In addition, the creosote treatment on the pilings had leached out.  The originally 10 inch diameter pilings were reduced to between 6 and 8 inches in diameter from wear and tear; that there was barnacle growth and checking and cracking on the pilings; and that the bolts were wasted, rusted, and corroded.  Cracks, borers, and hourglassing diminish the useful life of the pilings.  The dock had depreciated since it was originally constructed, and a newly built dock would inevitably increase the useful life of the dock from the time of the allision.

The Costa dock was built in 1957.  The pilings were last replaced in 1987.  Given that the dock survived for thirty years before its pilings were replaced, that the dock would not have been entirely depreciated in 1987 when the pilings were replaced (as it was still standing and in use), and that the pilings were able to overcome their age because there were so many of them, the court finds that the useful life of the dock was 32 years.  The dock was significantly depreciated at the time of the allision.  However,

the court cannot say it had depreciated to an almost non-existent value.  Given the dock's 32 year life expectancy and the fact that the pilings were last replaced 21 years before the allision, the dock was two-thirds depreciated.

F.  Cost of Repairing the Pier

The parties introduced four different proposals for repairing Costa's dock after the allision, as well as an estimate for the cost of repair from a marine surveyor.[10]

First, Connecticut Pile Driving, L.L.C. ("Connecticut Pile"), proposed to remove and replace 100 feet of the pier, install approximately 28 piles, and replace and repair the handrail where damaged.  The cost to complete these repairs was estimated at $42,300.00.

Second, Norwalk Marine proposed that, to repair the portions of the pier that were damaged, it would need to replace 25 feet of the wooden jetty section which included 10 pilings, supply and install 20 new piles, replace 65 feet of decking, replace 65 feet of handrails on both sides, attach the new sections to the existing structure.  The cost to complete these repairs was $75,600 including tax.  The price did not include the cost of obtaining necessary permits.  In addition, the price did not include the cost of mobilization.

The Norwalk Marine estimate only proposed replacing approximately 65 feet of decking and handrail.  However, approximately 100 feet of the dock was damaged by the Moondance.  In a later proposal that breaks down the cost of repairing the damaged portions of the dock, Norwalk Marine estimated that repairing 65 feet of damaged dock would cost between $40,000 and $45,000, and that repairing the timber groin would

_____

[10] The court does not consider the proposal from Connecticut Pile to be a fair estimate of the cost of repair to the dock because it is an extreme outlier as compared to the other proposals.

cost between $15,000 and $25,000.  Even at the upper end of both estimates, the numbers do not match the $75,600 originally proposed for repairing the damaged portion of the dock.  Assuming it would cost $50,000 to repair 65 feet of damaged dock, it would cost an additional $26,923 to repair the additional 35 feet of dock damaged by the Moondance.  Therefore, the court finds that the total cost of repair under the Norwalk Marine estimate would be approximately $100,000.

Third, G&C Marine Services ("G&C Marine") proposed to remove all damaged piles, remove damaged sections of the pier and handrail, replace approximately 90 feet completely and repair other sections where required, install 26 new timber piles, install split caps, joists, and decking in damaged areas, install new a handrail, remove section of damaged timber groin, and install new timbers and attach to the existing groin. Including tax, the cost of repair was estimated at $154,760.  G&C Marine's estimate did not include the cost of mobilization.

Fourth, Blakeslee, Arpaia, Chapman, Inc. ("Blakeslee") proposed to repair the pier for $351,540.  The proposal included, "mobilization, demobilization, material handling, debris disposal, and onsite shifting of floating equipment;" extraction of broken piles and installation of 30 new piles; and removal and installation of split caps, timber stringers, timber decking, handrail, gazebo, and timber jetty.  The proposal was for removal and installation of the entire pier as opposed to only the damaged areas.

According to Mr. Fucci, paragraphs 4, 5, and 6 of the proposal pertain to the entire length of the dock as opposed to only the damaged sections of the dock.  Taking 30 percent of those numbers to reflect the damaged portion of the dock, those paragraphs propose $40,296 in costs as opposed to $134,320.  Paragraph 7 relates to

12

repair of the gazebo and bird detractors (both of which are near the end of the pier), which Mr. Fucci testified were not near where he saw the damage from the Moondance. Therefore, subtracting the cost of replacing the gazebo, bird detractors, and undamaged portions of the dock, Blakeslee's estimate to repair the portions of the dock damaged by the Moondance is estimated at $245,516.

Fifth, Stafford Marine Service, LLC ("Stafford"), set forth its estimates for the cost of repair as part of its survey of the dock for insurance purposes. Stafford estimated that it would cost between $235,000 and $300,000[11] to remove the entire dock. This estimate was based on installing the dock on 15 foot centers (as opposed to the 5 foot centers it was previously on) with pressure treated pilings closer to a 14 inch diameter as opposed to the 10 inch diameter previously found. Replacement costs were estimated at $150 per square foot for 1,100 square feet, totaling $165,000. This included replacement of the entire dock and the ramps. Electrical and water service would cost $15,000 and new breakwater would cost an additional $30,000. Disposal and removal fees would be approximately $25,000. Stafford's estimate is based on the total replacement of a 200 foot dock. Because the damaged portion of the dock was only 100 feet, rather than costing $165,000 to repair the dock, it would cost $82,500. The total cost of repair would be $152,500; however, as Stafford noted that "unknowns" could cost an additional $65,000, the cost of repair could be as high as $217,500.

Both Norwalk Marine and G&C Marine failed to include mobilization costs in their estimates. Based on the range of estimates set forth by Mr. Hilts, Blakeslee, and

---

[11] According to Stafford, the price could be as high as $300,000 "considering the unknowns." Pl. Ex. 14 at 3.

Stafford for the cost of mobilization, and because Mr. Hilts' testimony and Stafford's estimate for mobilization are more in line than Blakeslee's proposal, the court finds that mobilization should cost $25,000.  By adding the cost of mobilization, the total costs of repair to the damaged portion of the dock—as proposed by Norwalk Marine and G&C Marine—would be $125,000 and $179,760, respectively.  Blakeslee's estimate would be $220,516 assuming mobilization costs of $25,000 instead of $50,000.  Stafford's estimate—at the lowest end—would be $152,500, and $217,500 at the highest end.

Given that the estimates of G&C Marine, Stafford, and Blakeslee are all within an approximately $65,000 window and that those estimates are the most detailed—they break down the estimates for repairing the deck, handrail, and timber jetty/groin/breakwater—the court finds, by taking the average of these proposals, that a reasonable approximation of the cost to repair the damaged portion of the dock is $186,000.[12]

G.  Permitted Pier

Mr. Costa obtained a permit to rebuild the dock.  The permit authorized Mr. Costa to retain an "approximately 400 linear foot riprap shoreline, an eight inch diameter pond inflow/outflow pipe, a 28 foot long timber groin, a two foot long timber groin, a 20 foot wide by 90 foot long stone groin, and a nine inch tall by 60 foot long timber groin."  Def. Ex. 219, at 3-4.  The permit authorized Mr. Costa to replace the nine inch by 60 foot long timber groin, remove a derelict dock, and install a dock comprised of a six foot by

---

[12] "While . . . damages must be proven with 'reasonable certainty,' mathematical precision is not required and reasonable approximation will suffice."  Great Lakes Bus. Trust v. M/T Orange Sun, 855 F.Supp.2d 131, 149 (S.D.N.Y. 2012) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555,563 (1931)).

256 foot fixed pier, a four foot by 36 foot ramp, an eight foot by 20 foot float, and associated pilings.

## III.   CONCLUSIONS OF LAW

Costa counterclaims that, "the damage to his pier was caused by Crowley's "acts, omissions, strict liability, fault, negligence, and breach of federal safety and operating regulations."  Defs.' Answer to Verified Compl. and Counterclaims (Doc. No. 18) ("Defs.' Answer") 5–6.  "The elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law. These elements include duty, breach of that duty, and causation."  In re Re, No. 07–CV223–JFB, 2008 WL 4069747 at *3 (E.D.N.Y. Aug.27, 2008) (citing Petition of Kinsman Transit Co., 338 F.2d 708, 721 (2d Cir.1964)).

### A.  The Louisiana Rule

A moored vessel that breaks away from its moorings is presumed to be at fault. Martinez v. United States, 705 F.2d 658, 661 (2d Cir.1983) (citing The Louisiana, 70 U.S. 164,173 (1865)).  This rule applies in cases where an unmoored vessel collides with a stationary object.  See Union Pacific R. Co. v. Kirby Inland Marine, Inc. of Mississippi, 296 F.3d 671, 673 (8th Cir. 2002) (citing The Oregon, 158 U.S. 186, 197 (1895)).  Essentially, the Louisiana rule shifts the burden to the ship's owner to show that he was not negligent.  See The Charles H. Sells, 39 F.2d 631, 633 ("it means no more than that the vessel must show herself free from 'fault' in the ordinary sense").

There are three ways in which a vessel owner may rebut the presumption under the Louisiana rule: by showing that (1) the allision was the fault of the stationary object; (2) the moving vessel acted with reasonable care; or (3) the allision was an unavoidable

accident.  See Zerega Ave. Realty v. Hornbeck Offshore Transp., 571 F.3d 206, 211 (2d

Cir. 2009).  Because it is undisputed that the Moondance struck Costa's pier, the

Louisiana rule places the burden on the plaintiffs to rebut a finding that Crowley was

negligent.  The court will consider each method for rebutting the presumption.

        1.  The allision was the fault of the stationary object

This first method for rebutting the presumption of negligence is analogized to the

common law tort theory of contributory negligence.  See Fischer v. S/Y Neraida, 508

F.3d 586, 593 (11th Cir. 2007).  The plaintiffs argue that, but for Costa's "statutory

violations in the construction of an illegal structure encroaching into the navigable

waters of the United States, this accident would not have occurred."  Pl. Trial Mem. at

18.  However, the trial evidence does not support a finding that the accident would not

have occurred but for the fact that Costa built a 320 foot pier instead of the 160 foot pier

he was permitted to build.  After the Moondance broke free from its moorings, it

proceeded down the harbor, and hit the pier in three places, including toward the end of

the dock, farthest into the water, where the gazebo stood.  Trial Tr. at 441/18-22,

442/21-22; see also Def. Ex. 208, at 55-56l; Pl. Ex. 9, at 1.  There is no evidence that

the boat hit the water end of the dock first; the evidence merely shows that the boat hit

the dock in three places, including the outermost part of the dock.  The plaintiffs have

failed to introduce evidence that, but for the fact that Costa built a longer dock than

permitted, the Moondance would not have hit Costa's dock.[13]  Therefore, the plaintiffs

have failed to meet their burden under the first method of rebutting the Louisiana

presumption.

> 2.  The moving vessel acted with reasonable care

In general, the standard for negligence in admiralty and maritime is the familiar,

reasonably prudent person under the circumstances.  See, e.g., Rainey v. Paquet

Cruises, 709 F.2d 169, 171 (2d Cir.1983).  "Since there are occasions when every

vessel will break from her moorings, and since, if she does, she becomes a menace to

those about her; the owner's duty, as in other similar situations, to provide against

resulting injuries is a function of three variables: (1) The probability that she will break

away; (2) the gravity of the resulting injury, if she does; [and] (3) the burden of adequate

precautions."  United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947).

Crowley failed to exercise reasonable care when he did not have someone move

the Moondance from its mooring in Black Rock Harbor once forecasters predicted

inclement weather for Saturday, October 25, 2008.  The court credits Mr. Billings'

testimony that boat owners should secure loose canvas, tie up their sails or remove the

sails, check the mooring gear, make sure the chafing gear is in place, or remove the

boat from the harbor when inclement weather is forecasted.  Further, the court credits

---

[13] The plaintiffs argued that, "[h]ad the illegal portion [of the dock] not been there, the vessel
would have passed right by Costa's premises and no damage would have been sustained."  Pl. Post-trial
Brief at 17.  This is pure speculation.  According to the plaintiffs, the Moondance "struck the outermost,
illegal portion of the dock which stopped its course of direction and caused it to proceed down the dock
and come to rest on Costa's premises."  Id.  Although they made this argument in their Brief, there is
simply no evidence as to which part of the dock the Moondance hit first.  It is equally plausible that the
Moondance struck the center of the dock first, bounced to the water's end of the dock, and then slowly
drifted to the land end, where it ultimately rested.  Because it is the plaintiffs' burden, under the Louisiana
rule, to prove that the Moondance would not have struck the dock had it been 160 feet in length rather
than 320 and, having failed to introduce any evidence as to where the Moondance struck Costa's pier, the
court finds the plaintiffs' argument unavailing.

Mr. Ruskay's testimony that boat owners should remove the sails, add additional lines or pennants, or, ideally, move the boat off the mooring.  Crowley himself testified that, if foul weather was expected, he would move the boat to a more secure location alongside the dock at Captain Cove Seaport.  Crowley did not take any of these steps prior to the October 25, 2008 storm.  Based on this testimony, and the unpredictability of fall storms, the court finds that, when very bad weather is forecasted—such as it was for October 25, 2008—a reasonably prudent boat owner would remove his boat from the harbor.

Crowley had sufficient warning that inclement weather was forecasted and, therefore, had time to have his boat moved from its moorings.  On Wednesday, October 22, 2008, forecasters predicted a storm for Saturday with potential gale force winds.  On Thursday, October 23, the Weather Service Office continued to predict gale force conditions for Saturday.  Although the forecast changed on Friday, there is no evidence before the court that Crowley took any steps to secure his boat in light of the storm forecasted for Saturday at any time up to the Friday morning forecast.

Crowley testified that, when he is out of town, he asks his wife, Mr. Billings, or a friend to keep an eye on the boat. But the court found that Crowley did not inform Mr. Billings of his trip.  Regardless, there is no evidence that Crowley contacted Mr. Billings,

or anyone else, once forecasters predicted the Saturday storm on Wednesday and Thursday. There is no evidence that Crowley asked anyone to move the boat once forecasters predicted severe weather, even though Mr. Billings testified that it would only take five minutes to take the launch from the Black Rock Yacht Club to where the Moondance was moored, and Crowley testified that another boat owner could have gained access to the Moondance by obtaining the combination lock code.  In fact, Crowley testified that it was common to move a boat off its mooring to a more secure area alongside the dock at Captain Cove, and that he has moved other owners' boats for them when they were unavailable.  Therefore, the court finds that someone else easily could have moved the boat for Crowley.

Furthermore, even though the weather forecast changed on Friday evening, numerous witnesses testified about the variability of fall weather; therefore, a last-minute alteration to the forecast does not make its reasonable for Crowley to fail to have taken steps to, and to, secure his boat.[14]

Applying the three-prong test set forth in Carroll Towing, the court finds that Crowley was negligent in failing to remove the Moondance from Black Rock Harbor in advance of the Saturday storm.  See Carroll Towing Co., 159 F.2d at 173.  First, the testimony shows that there was a high probability that the boat would break away.  The

_____

[14] Both weather experts testified that sometimes the better forecast is made two or three days before the storm.  See Trial Tr. at 268/13-14 (testimony of Art Horn); 505/4-5 (testimony of Trevor Bevens).

forecast on Wednesday through Friday called for a severe storm, one which would call for a reasonably prudent boat owner to take his boat off of its moorings so as to prevent damage.  Second, the resulting injury is and was significant.  The Moondance was a 44 foot boat with the potential to damage nearby property, including other boats and structures, such as Costa's dock.  Third, the burden of taking adequate precautions was minimal.  From Black Rock Yacht Club, it would only take five minutes to get to where the Moondance was moored in Black Rock Harbor.  There were people available, even in Crowley's absence, to move the Moondance.  Therefore, the plaintiffs have failed to meet their burden as to the second method for overcoming the Louisiana presumption.

   3. The allision was an unavoidable accident

   To establish this third method of rebutting the Louisiana presumption, the plaintiffs have to prove that the accident was one in "which human skill and precaution, and a proper display of nautical skill[,] could not have prevented."  The Louisiana, 70 U.S. at 173.  "It is well-established that the affirmative defense of vis major or force of nature (formerly 'Act of God') is the concept of a natural force of such inevitability and irresistibleness that man cannot cope with it, either to predict, forestall it or control it when it arrives."  American River Transp. Co. v. Paragon Marine Servs., Inc., 213 F.Supp.2d 1035, 1060 (E.D. Mo. 2002) (quoting Woodbine Auto, Inc. v. Southeastern Pennsylvania Transp. Authority, 8 F.Supp.2d 475, 481 (E.D. Pa. 1998)).  "The burden of proving an inevitable accident or an Act of God rests heavily upon the vessel asserting such defense."  Bunge Corp. v. Freeport Marine Repair, Inc., 240 F.3d 919, 926 (11th Cir. 2001) (quoting Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960)).

In The Louisiana, the court concluded that the defendant was negligent in anchoring the vessel and, therefore, the only way in which the court could find an inevitable accident was if the change in tides would have unmoored the vessel even had all reasonable preparations been made.  See id. at 174; see also Fischer, 508 F.3d at 595.  This court does not conclude that the allision was an unavoidable accident.  Indeed, it concludes it was an avoidable accident.  Had Crowley had the Moondance taken off its moorings and moved to the marina—a reasonable and very doable measure—this accident would not have occurred.  See Fischer, 508 F.3d at 598 (stating that the "Act of God" defense "sensibly requires a showing that all reasonable measures would have been futile").  Surely, the plaintiffs have failed in establishing that such a measure would have been futile.

B.  Causation

Although the Louisiana rule "creates a presumption of negligent operation, it does not create an additional presumption that the allision caused whatever damages are alleged."  Zerega, 571 F.3d at 212 (explaining the Oregon rule, which sets forth the same rule as that established in The Louisiana for vessels that hit stationary objects).  "As in any negligence case, the plaintiff in a maritime allision case bears the burden of proving by a preponderance of the evidence that the defendant's negligence caused the alleged damages."  Id.

The court finds that Costa has met his burden of proving that the cause of the damage was due to the impact from Crowley's boat.  Multiple witnesses testified to seeing the Moondance resting against Costa's pier after the storm.  Pictures depict the Moondance resting against the dock.  See Def. Ex. 208.  According to Mr. Truslow, the

Moondance was the only boat that broke loose from the Black Rock Harbor Yacht Club; therefore, the Moondance was "the only vessel that was that far south that could have impacted the dock." Trial Tr. at 444/5-12. Therefore, the court finds by a preponderance of the evidence that the damage to the dock was caused by the Moondance breaking loose from its moorings and running into the dock three times.

    C. <u>The Pennsylvania Rule</u>

    The plaintiffs claim that Costa violated both state and federal law when he constructed a pier twice as long in length as allowed by permit, and that Costa's violation triggers application of the <u>Pennsylvania</u> rule. <u>See</u> Pl. Trial Memo (Doc. No. 117) at 16. The Supreme Court held in <u>The Pennsylvania</u> that, when "a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." 86 U.S. 125, 136 (1873). If the <u>Pennsylvania</u> rule applies, "the burden rests upon . . . [the party who violated the statute] of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." <u>Id</u>; <u>see</u> <u>also</u> <u>Director General of the India Supply Mission v. S.S. Maru</u>, 459 F.2d 1370, 1374 (2d Cir. 1972). This burden shifts to the

statutory violator regardless of whether the <u>Louisiana</u> rule also applies.[15]  <u>See</u> <u>American</u>

<u>S.S. Co. v. Hallett Dock Co.</u>, 862 F.Supp.2d 919, 933-934 (D. Minn. 2012) (citing

<u>Superior Const. Co., Inc. v. Brock</u>, 445 F.3d 1334-1340 (11th Cir. 2006).

The burden first rests on the party invoking the <u>Pennsylvania</u> rule—here the

plaintiffs—to establish by a preponderance of the evidence that the <u>Pennsylvania</u> rule

applies.  <u>See</u> <u>Hatt 65, LLC v. Kreitzberg</u>, 658 F.3d 1243, 1252 (11th Cir. 2011).  For the

rule to apply, three elements must be present: "(1) proof by a preponderance of

evidence of violation of a statute or regulation that imposes a mandatory duty; (2) the

statute or regulation must involve marine safety or navigation; and (3) the injury suffered

must be of a nature that the statute or regulation was intended to prevent."  <u>Id.</u> (citing

<u>Folkstone Maritime, Ltd. V. CSX Corp.</u>, 64 F.3d 1037, 1047 (7th Cir. 1995)).

The plaintiffs claim that Costa violated two statutes: the Rivers and Harbors Act,

33 U.S.C. § 403, and a Connecticut statute which requires permits for the erection of

structures, Conn. Gen. Stat. § 22a-361.  The court considers each in turn.

Section 403 of Title 33 of the United States Code states, in relevant part, that:

> "[I]t shall not be lawful to build or commence the building of any wharf, pier,
> dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port,
> roadstead, haven, harbor, canal, navigable river, or other water of the United
> States, outside established harbor lines, or where no harbor lines have been
> established, except on plans recommended by the Chief of Engineers and
> authorized by the Secretary of the Army."

---

[15] The plaintiffs argue that, because there are "dueling" presumptions, the <u>Pennsylvania</u> Rule and the <u>Louisiana</u> Rule, "at the very worst, both presumptions net each other out, leaving Costa with his original burden to prove actionable negligence on the part of Crowley."  Pl. Trial Memo. At 17.  As stated above, if the <u>Pennsylvania</u> rule applies, that rule overrides application of the <u>Louisiana</u> rule.  However, the <u>Pennsylvania</u> Rule does not require a party to bear full responsibility for an allision.  Liability is apportioned according to comparative fault.  <u>See</u> <u>Osprey Ship Management, Inc. v. Foster</u>, 2008 WL 4371376, at *22 (S.D. Miss. Sept. 18, 2008) (citing <u>Pennzoil Producing Co. v. Offshore Express, Inc.</u>, 943 F.2d 1465, 1472 (5th Cir. 1991)).

The evidence shows that Costa's pier measured 320 feet in length, but his permit only permitted him to construct a 160 foot pier. <u>See</u> Trial Tr. at 149/20-25-150/1. However, despite the fact that Costa did not have a proper permit, he is absolved of meeting section 403's permit requirement if the Grandfather Clause applies, 33 C.F.R. § 330.3(b). <u>See</u> <u>Bunge Corp.</u>, 240 F.3d at 926. The Grandfather Clause states that structures completed before December 18, 1968, so long as they do not interfere with navigation, do not require permitting. 33 C.F.R. § 330.3(b). Costa built his pier in 1957, thereby meeting the first requirement. Def. Ex. 206 at 2. Second, the court finds that the pier did not interfere with navigation. The mere fact that the Moondance hit the pier while traveling down the Harbor does not indicate that the pier interfered with navigation. <u>See</u> <u>Bunge Corp.</u>, 240 F.3d at 926 (finding that Bunge's facility, which was struck by a vessel that went off its moorings during a hurricane, did not interfere with navigation). The Connecticut Department of Energy and Environmental Protection has authorized Costa to rebuild his pier at well over the originally permitted, 160 foot length. <u>See</u> Def. Ex. 219 (allowing installation of a fixed pier 256 feet in length, a 36 foot ramp, and a 20 foot float). Therefore, there is no evidence to indicate that a 312 foot pier interferes with navigation. That Costa's 1957 pier was eight feet longer does not support a finding of interference. Because the Grandfather Clause applies, the court finds that the plaintiffs have not met their burden of proving Costa violated section 403 of title 33 of the United States Code.

The plaintiffs also claim that Costa violated a Connecticut statute, Conn. Gen. Stat. § 22a-361, by building his pier beyond the originally permitted length. The Connecticut statute provides, in relevant part, that:

> "No person . . . shall . . . erect any structure . . . or retain or maintain any structure . . . in the tidal, coastal or navigable waters of the state waterward of the coastal jurisdiction line until such person . . . has submitted an application and has secured from the Commissioner of Energy and Environmental Protection a certificate or permit for such work and has agreed to carry out any conditions necessary to the implementation of such certificate or permit."

The plaintiffs have met their burden of showing that Costa violated a statute or regulation that imposes a mandatory duty.  See Bunge Corp., 240 F.3d at 926.  Costa's pier exceeded the length permitted by the Connecticut Department of Energy and Environmental Protection ("DEEP") permit.  See Def. Ex. 206 at 2; see also Hatt 65, 658 F.3d at 1250 (considering whether the defendant violated a state statute).  However, the court finds that the plaintiffs failed to meet their burden of proving that the statute or regulation involved marine safety or navigation. See Bunge Corp., 240 F.3d at 926.  According to John Hilts, who prepares permits for persons seeking to construct structures on coastal waters in Connecticut and New York, DEEP would likely have rejected a permit for such a long pier had it not been in place prior to the permit.  Because there was already "an impact on coastal waters and coastal resources in place," DEEP was more amenable to approving the permit. Trial Tr. at 148/15-18.  The obvious inference is that DEEP considers the environmental impact of the pier, primarily, when determining whether to approve an initial permit for a pier.

Furthermore, the statute itself states that the Connecticut DEEP may adopt regulations for granting permits "giving due regard for the impact of regulated activities and their use on the tidal, coastal or navigable waters of the state, adjoining coastal and tidal resources, tidal wetlands, navigation, recreation, erosion, sedimentation, water quality and circulation, fisheries, shellfisheries, wildlife, flooding and other natural disasters and water-dependent use opportunities."  Conn. Gen. Stat. § 22a-361(c).

Although the statute mentions navigation, the court finds, based on the complete list of considerations along with Mr. Hilts' testimony, that the purpose of the permitting process is largely to protect the marine and coastal environment.[16]  The plaintiffs have not introduced any evidence to suggest otherwise.[17]

The court finds that the plaintiffs have not met their burden of showing by a preponderance of the evidence that the Pennsylvania Rule applies regardless of whether Costa violated either the federal or state statutes.  The burden, therefore, remains with the plaintiffs.  Because they have not met their burden to rebut the presumption of fault established by the Louisiana rule, the court concludes that the plaintiffs are liable for the damage to Costa's dock.

### D. Limitation of Liability

The plaintiffs raise the defense of limitation of liability under the Limitation of Liability Act, 46 U.S.C. §§ 30501-30512.  The Act states, in relevant part, that "the liability of the owner of a vessel for any claim, debt, or liability [arising from any loss, damage, or injury by collision . . . done, occasioned, or incurred without the privity or knowledge of the owner] shall not exceed the value of the vessel and pending freight."

---

[16] Courts have held that the Rivers and Harbors Act, 33 U.S.C. § 403, is a statute that involves marine safety or navigation.  See Mike Hooks Dredging Co., Inc. v. Eckstein Marine Service, Inc., et al, 2012 WL 1070106, at * 5 (E.D. La. Mar. 29, 2012) ("The Pennsylvania Rule applies to breaches of a [dredging operations] permit issued by the Corps."); American S.S. Co. v. Hallett Dock Co., 862 F.Supp.2d 919, 936-939 (D. Minn. 2012) (concluding that an initial presumption under the Pennsylvania Rule is supported by violation of the obstruction clause of 33 U.S.C. § 403).  Although the Rivers and Harbors Act is similar to the Connecticut statute in that they both require a permit for marine structures, the federal act specifically prohibits obstructions to the navigable capacity of any waters of the United States.  33 U.S.C. § 403.  The cases determining that violation of the Rivers and Harbors Act triggers the Pennsylvania Rule relate to obstructions, under the first clause of the Act, rather than building structures without a permit, as prohibited under the second clause of the Rivers and Harbors Act.

[17] While the Connecticut statute lists the impact on "navigation" as one factor to consider when reviewing permits, given the laundry list of factors, most of which reflect the statute's focus on coastal impact, the court does not believe use of the word "navigation" in that list alone suggests the statute involves marine safety or navigation.

46 U.S.C. § 30505.  "The phrase 'privity or knowledge' is a 'term of art meaning complicity in the fault that caused the accident.'"  In re Complaint of Messina, 574 F.3d 119, 126 (2d Cir. 2009) (citing Blackler v. F. Jacobus Transportation Co., 243 F.2d 733, 735 (2d Cir. 1957)).  To determine whether the Limitation of Liability Act applies, the court follows a two-step approach: (1) was the accident caused by conduct that is actionable, that is, by negligent conduct, and (2) was the actionable conduct without the vessel owner's privity or knowledge.  See In re Complaint of Messina, 574 F.2d at 126-27.

As to the first element, the burden of proof is on the claimant here, Costa.  Id.  To determine whether there was actionable conduct, "[t]he test is, could the collision have been prevented by the exercise of ordinary care, caution and maritime skill?"  The Jumna, 149 F. 171, 173 (2d Cir. 1906).  The court has already determined that Crowley did not exercise reasonable care because he failed to remove the Moondance from its moorings and take it to a more protected location and, if he had, the accident would not have occurred.  See supra, pp. 17-21.  Therefore, the first element is met.

As to the second element, "[i]n the case of individual owners, it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury."  In re Complaint of Messina, 574 F.2d at 126 (quoting Coryell v. Phipps, 317 U.S. 406, 411 (1943)).  Crowley, as owner of the Moondance, failed to take the necessary steps to remove his boat from the water in light of the pending storm.  "Where the owner's negligent act caused the alleged injury . . . all of the requirements of 'privity' are satisfied.  Id. (quoting Tug Ocean Prince, Inc. v. United States, 584 F.2d

1151, 1169 (2d Cir. 1978)).  Therefore, because the actionable conduct—i.e., failing to remove the Moondance from the water—occurred with Crowley's privity, the court finds that the plaintiffs are not entitled to limitation of liability.

E.  Damages

Having found the plaintiffs liable for the allision with Costa's dock, the court must determine the appropriate calculation of damages.  Both parties have submitted evidence regarding the cost of repairing the damaged portions of the dock.  Both parties agree that the Moondance struck the dock in three places, destroying an approximately 90 to 100 foot portion of the dock and damaging the jetty.  The court found that the cost of repairing the damaged portion of the pier is $186,000.  See supra, pp. 11-14.

1.  Depreciation

The plaintiffs claim, however, that damages are "limited by federal maritime law due to the severely deteriorated condition of the pier immediately prior to the accident." "Courts have generally allowed depreciation in awarding damages for injury to wharfs, bridges, and similar installations." Seaboard Air Line R. Co. v. Marine Industries, Inc., 237 F.Supp. 10 (E.D.S.C. 1964).  "If some of the repairs are required because of age, deteriorated condition, service, or because of prior collisions, the entire cost of the repairs will not be allowed as damages." Patterson Terminals, Inc. v. S.S. Johannes Frans, 209 F. Supp. 705, 710 (E.D. Pa. 1962); see also Oakdene Compress & Warehouse Co. v. S.S. Cities Service Norwalk, 242 F.Supp. 148, 150-51 (E.D.S.C. 1965) ("[T]he courts have generally allowed depreciation in cases of damages to wharves and similar structures, and this practice has continued since the passage of the Act of 1948 bringing such cases within the admiralty jurisdiction."); Brooklyn Waterfront

28

Terminal Corp. v. International Terminal Operating Co., 211 F.Supp. 702, 708 (S.D.N.Y. 1962) ("Plaintiff is entitled to be made whole for the damage caused to the pier as it existed— that is, an award necessary to restore the pier to its condition as of the damage date.").

The Fifth Circuit has held that, in cases involving allisions with fixed structures, the measure of damages includes the cost of repairs without any deductions for depreciation if the repairs do not extend the life or enhance the value of the structure. See Paktank Corp.-Deer Park Terminal v. M/V M.E. Nunez, 35 F.Supp.2d 521, 530 (S.D. Tex. 1999) (emphasis added) (failing to allow a reduction for depreciation when repairs to dolphin did not extend its useful life or enhance its value, but also reducing award for damage to fender mat because fender mat had prior damage); Petition of M/V Elaine Jones, 480 F.2d 11, 27 (5th Cir. 1973) (stating that since "repair may leave property in a better condition[, d]epreciation, which in terms of a declining dollar figure reflects the annual depletion of an item's continuing usefulness for a given purpose, then becomes a handy tool to reduce the recovery for repair costs to the level necessary to return the injured party to the economic position in which he was found").

"[W]here the expected useful life of the property after repairs is the same as it was at the time of its acquisition by the plaintiff, the straight-line depreciation formula should be applied." Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 305 (5th Cir. 1975). The court found that the useful life expectancy of the dock at the time of acquisition was 32 years. See supra, p. 10. There is no evidence before the court to suggest that the life expectancy of the dock after it is repaired should be any different. Because the useful life of the dock after repairs is the same as it was at the time of

acquisition, the court applies the straight-line depreciation formula.  See Freeport, 526 F.2d at 305.

When applying the straight-line depreciation formula, "the increase in value is deducted from the plaintiff's recovery for the cost of repairs."  Id. at 304.  The court has already found that the dock was two-thirds depreciated at the time of the allision.  Therefore, the recovery is reduced by two-thirds, to $62,000.

### 2.  Prejudgment interest

Costa also requests pre-judgment interest.  "[P]rejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances," including "the most obvious example. . .  the plaintiff's responsibility for 'undue delay in prosecuting the lawsuit.'"  See City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 196 (1995).  There is no evidence before the court to suggest this case warrants an "exceptional" departure.  Therefore, the court awards pre-judgment interest.  See Great Lakes, 855 F.Supp.2d at 155 ("Granting of pre-judgment interest is, in fact, the rule rather than the exception.").

"The rate of interest to be applied is a matter within this Court's discretion, as is the date when interest accrues, and whether interest is to be compounded."  Id. Prejudgment may be awarded from the time of injury, from the time of payment for repairs, or from the time when repairs could have been made if the damage was not repaired.  See Independent Bulk Transport, Inc. v. Vessel Morania Abaco, 676 F.2d 23, 25 (2d Cir. 1982).  "An interest award should 'reimburse the claimant for the loss of use of its investment or its funds from the time of such loss until judgment is entered.'"  Hudson River Cruises, Inc. v. Bridgeport Drydock Corp., 892 F.Supp. 380, 388 (D.

Conn. 1994) (citing <u>Matter of Bankers Trust Co.</u>, 658 F.2d, 103, 108 (3rd Cir. 1981)).

Because "it has long been held proper for admiralty courts fully to restore the injured

party to his condition at the time of the injury by allowing and fixing prejudgment interest

from the date of the loss in proceedings involving property damage," <u>see</u> <u>Petition of City</u>

<u>of New York</u>, 332 F.2d 1006, 1008 (2d Cir. 1964), the court will set interest from the

date of injury, October 25, 2008.[18]

Sources for setting the prejudgment rate include: (1) the statutory rate in the

forum state; (2) the average prime rate or adjusted prime rate; and (3) the yield on

short-term U.S. Treasury Bills.  <u>See</u> <u>Great Lakes</u> 855 F.Supp.2d at 156.  The average

prime rate interest from the date of the allision—October 25, 2008—to the present is

3.28%, based upon the following prime rates that were in effect.

| Date of Rate Change | Rate |
| --- | --- |
| October 8, 2008 | 4.50% |
| October 29, 2008 | 4.00% |
| December 16, 2008 | 3.25% |

<u>See</u> <u>id.</u>; <u>see</u> <u>also</u> History of the U.S. (Fed) Prime Rate, http://www.fedprimerate.

com/wall_street_journal_prime_rate_history.htm (last visited Feb. 13, 2013).  The

federal prime rate has remained at 3.25% since December 16, 2008.

The court awards Costa prejudgment interest at the average prime interest

rate—3.28%—from the date the Moondance hit Costa's pier until the date of judgment.

---

[18] The court determined damages based on the cost of repair to the dock had Costa repaired it at the time of the injury, in 2008.  The award of prejudgment interest reflects the interest Costa would have earned on his funds had he expended them in 2008 to repair the dock.

**IV.     CONCLUSION**

Based on the preceding findings of fact and conclusions of law, this court orders that judgment in the amount of $62,000 and prejudgment interest calculated as set forth above, from October 25, 2008 at a rate of 3.28%—$8,581.79—without any compounding, enter in favor of the defendants/third-party plaintiffs (for a total of $70,581.79).  The Clerk is hereby ordered to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 14th day of February, 2013.


                    _____/s/ Janet C. Hall_____
                    Janet C. Hall
                    United States District Judge